Good morning, ladies and gentlemen. Our first case for this morning is Dowlen against the Commissioner of Social Security, Acting Commissioner Colvin. Mr. Browder. Good morning. Thomas Browder on behalf of the appellant, Henrietta Dowlen. May it please the court. This case involves an agency finding that this court commonly reviews, the RFC determination. As well as another finding, it reviews less commonly whether a person with that RFC determination can perform the claimant's past work at step four. This court generally requires the agency's adjudicators to confront evidence favoring disability, explain why it's rejected, and build a logical bridge that enables meaningful review. And in this case, the agency's adjudicator simply didn't live up to that standard. Most notably, the adjudicator failed to offer a careful appraisal of the vocational evidence in the record and assess each of the claimant's past jobs and explain how a person limited to frequent use of her hands can perform each of those jobs. He also ignored significant medical evidence supporting the claimant's allegations of difficulty using her upper extremities on a repetitive basis, corroborating her reports of profoundly limited daily activities due to those difficulties, and contradicting his assessment that the objective medical evidence shows generally normal functioning of her hands and arms. Well, he was resolving conflicting evidence, right? I mean, it seemed to me that the medical reports were not confirming that there was as much limited range of motion as she was testifying to. The ALJ was evaluating what is certainly, in some respects, mixed evidence. He states at one point when he's disregarding her reports of limited daily activities due to her upper extremity issues, that her hand functioning is normal. And isn't there some evidence of that from the various physicians? Dobson, he says he's giving significant weight to the opinion of Dobson and Ruiz of the Disability Determination Services. The state agency doctors here assessed no manipulative limitations at all, which was a finding that the adjudicator ultimately disagreed with. These doctors did not see all of the claimant's clinical examinations from 2013, which showed significant deficits with her left upper extremity. Now, to be clear, there are two issues going on with the claimant. She has a history of remote trauma to the right hand that resulted in pins and needles being put in her right hand. She also suffers from- That's a very old injury, right? It's a very old injury, but I think the evidence shows that it continues to impact her throughout the period that's relevant. And the ALJ concluded as much by limiting her right arm use to frequent. She's also dealing with an issue involving her cervical spine and an impingement of her nerve root that's causing cervical radiculopathy. Her symptoms related to this impairment began in April and May of 2012. During 2012, her neurological examinations with regard to that upper extremity are largely normal. She has tenderness and pain-related limitations, but the neurological limitations are normal. But by 2013, her functioning in that extremity is far from normal. Most significantly, in June of 2013, an examiner documented weakness throughout the left arm, diminished grip strength, and muscle atrophy in the left upper extremity, and the ALJ did not discuss this. Now, to be sure, this contradicts his assessment of the evidence as showing normal functioning of the hands and arms. But even if we give the adjudicator the benefit of the doubt and assume that he simply concluded the objective evidence wasn't as strong as the claimant's allegations indicated or limitations were, this court cannot meaningfully review that finding because it's not clear the ALJ considered the evidence of muscle atrophy in her left upper extremity. Do we know how bad that atrophy was, how much? The examiner didn't document how severe it was. He did document limited strength with motion in the left upper extremity and diminished grip strength, findings which were replicated when the claimant who lacked insurance eventually did get in to see a neurologist in her left upper extremity. The ALJ also did not discuss diagnostic testing from late 2013 showing that she has cervical radiculopathy, which is a pathology that correlates with her reported symptoms and limitations in her left upper extremity. So if we give the judge the benefit of the doubt in terms of what he wrote, that finding is still not reviewable because he did not confront the evidence that does not support that conclusion and explain why it was rejected so that this court can be sure he considered it. But he does conclude that she can, I mean, and even if we thought that there was a problem, and you have stressed this difference between two-thirds of the day and three-quarters of the day and all that stuff, but even if we thought she couldn't still be a claims clerk, the ALJ also thinks she could continue to work as a mail sorter. The ALJ's analysis of the claimant's past work is troubling in many respects. Dallin seems to have two or maybe three jobs that qualify as past work under the regulations. It's unclear because the record doesn't resolve the issue, the judge didn't make an effort to resolve the issue, and the judge did not conduct any meaningful analysis that allows this court to determine whether there are two or three jobs, what each of those jobs required, and so on and so forth. Between 1991 and 2001, she was working as a claims clerk for a temporary agency. She was hired permanently by an insurance company in 2001 to 2012. During her hearing, she focused most exclusively on her duties in the mail and distribution department, but she also indicated that she was sorting claims at a computer desk and had to get up and go to a copy machine to make copies of documents that were attached to those claims. In a report to the agency, she informed them that in this job she was sorting mail approximately one day a week, and the rest of the time she was auditing claims. This suggests that during that time working for Anthem, she was performing functions associated with a claims clerk. There's also an indication in her testimony that... So do we know, I mean, is that like sitting in front of a computer terminal and reading whether the numbers add up? What exactly is that? She testified that the first job, which was a claims clerk, was auditing claims that were filed with the insurance company to evaluate whether all the information on the claim was accurate, putting data into a computer system about those claims. So that presumably is keyboarding of some sort. Yes, and also conducting an analysis of whether there's another entity that could pay those claims. In her work history report that she submitted to the agency about her time at the insurance company, she said she sorted mail, but she also indicated that she audited claims, prepared daily activity reports, used a computer, and wrote or typed or used small objects for eight hours of each day. Now, to be clear, at the beginning of her testimony, she says when she started at the insurance company, she was working almost entirely in mail and distribution. But it's unclear how long she worked there and whether that. . . It was a rebuttal time, you know. Yes, Your Honor. It's unclear how long she worked there. And what this goes to is the ALJ didn't break each of these jobs up and evaluate independently whether each one qualified as past work under the agency's regulations, didn't confront the evidence showing that she was working as a claims clerk when she was working at the insurance company, and didn't explain how someone limited to frequent use of his or her hands can perform a job that requires them to use a keyboard for three quarters of each eight-hour day. Okay. Thank you. Mr. Adili. Good morning, Your Honors. May it please the Court, Javed Adili on behalf of the Commissioner. Please be careful to speak up. Sorry. I will endeavor to do so. The first thing that I'll address since it's the last thing the Court was talking about is the vocational expert testimony. I think that in our brief, we presented a cogent argument in defense of the claims clerk role, even though the vocational expert testified that it was often performed at 75% or functional, I'm sorry, manipulative activities were required 75% of the time rather than two-thirds of the time as reflected in DOT. But there was a range, wasn't there? I mean, you know, like the dots were really not connected between the vocational testimony and the actual demands of the job, I was concerned. I think that the ALJ's discussion at step four is exceedingly terse, Your Honor. That's absolutely true. But I also think the ALJ said enough with respect to the mail-sorter job for the Court to know precisely what the ALJ was thinking. Can you direct us to what you're thinking about? Sure. Because this paragraph six is, you used the word terse, I'll go with that. It doesn't say much. I mean, what it says is that according to the vocational expert's testimony, an individual with the limitations found in the RFC, and the RFC says three things. It says light work, an inability to climb ladders, and the ability to frequently reach handle and finger, to frequently use her hands. So do we know about fine motor, you know, finger? I mean, if you're sitting there trying to keyboard, you've got to be able to use your fingers. I mean, you're not going to hunt and peck all day. That's correct. So do we know how that relates to her, particularly the cervical spine problems on the left side? Well, I mean, I guess in our brief we made the argument that this collapses into an RFC inquiry, whether the ALJ's RFC adequately captured the claimant's impairments. Is that sort of what you're getting at, Your Honor? Yeah. I mean, so the ALJ reviews all these various doctors, and there are reports her grip strength was normal. This is as of August 2012. Fine finger skills were normal. Then she has a lapse because of her financial inability to see somebody. The ALJ sort of dismisses the testimony of Dr. Lucas, who is, in fact, her treating physician, doesn't give way to Dr. Combs either. That's correct. Well, I mean, what I would say, a few things. Dr. Combs' opinions predate the alleged onset date, which was revised. The claimant applied for benefits in June of 2012, having stopped working in April of 2012. She saw Dr. Combs before April, and in April and then again in May, Dr. Vicker released her to work with full restrictions, the strain of her right hand having resolved. And ultimately, I think that the agency's response with regard to RFC is threefold. One, the only opinions in the record support the ALJ's conclusion. And, in fact, the ALJ exceeded those opinions. So the state agency reviewers, Drs. Dobson and Ruiz, opined that she was capable of the full range of light work with no additional limitations. The ALJ partially credited the claimant's credibility and said, you know, she says that she can't manipulate constantly. I think that will say that she, you know, the record reflects that she can manipulate two-thirds of the time. And then she has a complaint about the pace, too, because, you know, being able to do things at a slow pace might not be adequate for work in the economy. She says that when she was doing this mail and distribution work, it was fast-paced, requires lifting, sorting of bundles, and so on. Right, Your Honor. I mean, the vocational expert testified that, at least vocationally, that's not considered to be a fast-paced job. And, again, I think that I would refer the court to the fact that no opinion supported the inclusion of additional limitations. I would also like to address briefly. So we do have to draw a distinction between her real past work and the sort of subset, if you will. The vocational expert is trying to say, well, typically in the economy, this is a lesser exertional job than her past work. So why doesn't that kick you over to Step 5, where the burden shifts to the commissioner? It doesn't kick you over to Step 5 because the agency, by regulation, has said that the ALJ can find that an individual can return to either her past work as she performed it or past work as it's generally performed in the national economy. And opposing counsel makes an argument in the brief that the ALJ should have inquired more about the way that she performed her job because that might have had some kind of effect on the analysis of how it's performed in the national economy. But I think this court has found many times that the DOT and the VE testimony is sort of where that information generally comes from. And the ALJ inquired about it here, got that information from the vocational expert. It gels with the DOT. That's what's reflected in Paragraph 6, even though obviously we would want the ALJ to, in an ideal world, to include more information and a greater and more detailed analysis. It's enough for this court to track the ALJ's reasoning, and it's supported reasoning. It's reasoning supported by the vocational expert's testimony. It's supported by the DOT, and it's consistent with the regulations. And so that conclusion, I think, is legally supported. With respect to the claimant's argument that the ALJ omitted discussion of the 2013 EMG and the June 2013 treatment note, the EMG confirmed a diagnosis of C6-C7 radiculopathy, but that diagnosis had been confirmed the year before by an MRI that was seen by, I believe, the consultative examiner and both of the state agency reviewers. Radiculopathy, as reflected in our brief, and one thing that I would point out, I think, is page 31, footnote 14, has a cite to a web article that was also cited in Appellant's brief that says, you know, many people have radiculopathy and are functional, right? And so the question is, if you have radiculopathy, are the limitations imposed by the radiculopathy so great as to require additional work-related limitations in the RFC? But isn't her testimony at that point important? Because, I mean, we have said in some cases that even if some people are tough and they're pushing themselves through intense pain to stay in the workforce, that's not what we're asking for. That's too much. Well, and the problem with that reasoning, Your Honor, is that it's incorrect under the regulations. So the regulations say that if you can work despite pain, then you are not disabled. And that seems draconian. I agree that it seems draconian. But you are simply, if you can push yourself through and can fully perform work without concessions. I'm not sure that's consistent with this court's jurisprudence. I think that if that's true, the court should reconsider its jurisprudence. But I think in this case... Or the commissioner should reconsider the regulations. Obviously, we're construing the statute. But if, in fact, that's true under the regulations, then I don't know that that... I mean, I'm agnostic on that point, Your Honor. What I would say with respect to the June 2013 treatment note is that it did document atrophy. Opposing counsel sort of seizes on that. But I think the August 2013 treatment note that the ALJ did explicitly discuss, which was done by a neurosurgeon, noted the bicep to be intact, so provided conflicting evidence on that issue. So we have cabining the June 2013 treatment note, the August 2012 consultative examination that noted no atrophy, and the August 2013 treatment note that noted no atrophy in the bicep. And, moreover, neither the doctors in June 2013 nor August 2013 provided any opinion. And I think the last thing that I would say is that the appellant bears or bore an equal duty to augment the record. And I think this is a bad case for this argument, but it's an important argument, which is... If you look at 20 CFR 1514, it says you have a duty to provide evidence in support of your claim. But if you can't, the agency will pay your doctor to give an opinion. At no point did the counsel below, before the ALJ, who... The same firm represents the claimant as represented here below, either ask one of those doctors in June or August of 2013 for a medical source opinion about the claimant's functioning, or even ask the ALJ to go get an opinion from one of them or from a CE. The ALJ, looking at the evidence after the hearing, had medical opinions of record about functioning. The appellant was making the same claims in 2013 that she had made to the CE in 2012, where the CE had found full functioning. And she had no... CE? I'm sorry, the consultative examiner, Dr. Anand. And so if... Okay, I think your time is up, and you have your point. So thank you very much. Thank you, Your Honor. And you have a little bit of your rebuttal time, Mr. Browder, so we'll hear you. I'll be brief. With regards to the medical evidence, the claimants do not have an obligation to present an opinion from a treating source to establish functional limitations. Oftentimes, practical realities associated with a particular doctor or a person's financial limitations in getting treatment prevent a person from obtaining an opinion. But, you know, we've struggled with this before. There is this concept that this is not purely an adversary matter and that the administrative law judge has the responsibility to develop the record. But the burden is on the claimant from steps one through four, which is this kind of case. And particularly somebody who's represented needs to at least ask. I mean, it seems that that's Mr. Adili's point. What's wrong with that? I think the primary limitation in this case was the claimant's financial limitations in actually getting regular treatment. But why not tell the, I mean, for purposes of developing the record in this case, why not get the ALJ as part of the process? Say we need to get one more opinion because we don't think the record before you is complete. As a practical matter, the adjudicators are handling a lot of cases, and they don't take well to those kind of delays. This case is not completely about a failure of evidence. The claimant alleged having manipulative difficulties. She presented objective evidence of atrophy and weakness in her extremities, and I believe that the ALJ did not adequately consider that objective evidence supporting her allegations. With regards to the work issue, the claimant worked as a claims preparer at Anthem, and the ALJ did not evaluate whether this was a mail sorter or a claims clerk or some combination of the both, and instead seems to have delegated that role to the vocational expert, and that's not consistent with the agency's policy role in SSR 8262. For those reasons, the appellant requests remand. Thank you very much. Thanks to both counsel. We'll take the case under advisement.